ENTERED
04/27/2018

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **PIONEER CARRIERS, LLC AND** | § | **Case No. 16-36356** |
| **TRANSPORT DRY FREIGHT, LLC,** | § | |
| | § | |
| **Debtors.** | § | **Chapter 11** |
| | § | |

<u>**MEMORANDUM OPINION REGARDING DEBTOR'S OBJECTIONS TO PROOFS OF
CLAIM NOS. 8 AND 14 FILED BY THE TEXAS WORKFORCE COMMISSION**</u>
**[Doc. Nos. 169, 172, 185, 186]**

## I.   INTRODUCTION

Generally, when a company wants to challenge a finding of employment by the Texas Workforce Commission (the "TWC") under the Texas Unemployment Compensation Act, the company follows a statutorily prescribed administrative appeals process. Once the TWC renders a final decision, the company may still then appeal the decision to a court of competent jurisdiction to review the agency's decision. Here, however, the parties never engaged in the statutorily prescribed administrative appeals process regarding the employment status of certain truck drivers who provide services to Pioneer Carriers, LLC (the "Debtor") and, thus, the TWC never rendered a final decision on the issue. Instead, as detailed more fully below, the issue of whether the truck drivers who provide services to the Debtor are the Debtor's employees or are independent contractors was brought before this Court via proofs of claim filed by the TWC.

On February 17, 2017, the TWC filed a proof of claim in the amount of $26,100.92 for alleged pre-petition unpaid unemployment taxes ("Claim No. 8"), owed by the Debtor, one of the debtors in this jointly administered Chapter 11 case.[1] [Claim 8-1]. On August 21, 2017, the

---

[1] Transport Dry Freight, L.L.C. is the other debtor in this jointly administered case. However, the claims in dispute are filed solely against Pioneer Carriers, L.L.C., and the objection to these claims is lodged solely by Pioneer Carriers, L.L.C.

TWC filed a second proof of claim in the amount of $1,267.10 for alleged unpaid post-petition taxes due under the Texas Unemployment Compensation Act ("Claim No. 14").[2]  [Claim 14-1]. On November 6, 2017, the Debtor filed separate objections to Claim No. 8 and Claim No. 14 (the "Objections"), arguing that it has no employees, that all individuals providing services for the Debtor are independent contractors and, thus, the Debtor does not owe any amounts to the TWC for employee-related charges.  [Doc. Nos. 169, 172].  On November 21, 2017, the TWC responded to the Objections, asserting that those individuals who provide services for the Debtor are in fact employees and not independent contractors and therefore the TWC's claims are valid. [Doc. Nos. 185, 186].  On April 10, 2018, this Court held a hearing (the "Hearing") on the Objections.  The only person to testify at the hearing was Pedro Lagos, the sole owner of the Debtor.  The Court admitted exhibits A – N submitted by the TWC and exhibits 1 – 7 submitted by the Debtor.  After listening to the testimony, reviewing exhibits, and hearing closing arguments, the Court then took the matter under advisement.

Pursuant to Federal Bankruptcy Rules 7052 and 9014,[3] the Court now issues these Findings of Fact and Conclusions of Law explaining its decision to sustain the Objections.  To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such; and to the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such.  The Court reserves the right to make additional findings and conclusions as it deems appropriate.

---

[2] The TWC used the standard proof of claim form in asserting that pre-petition unpaid unemployment taxes of $26,100.92 are owed.  With respect to the claim for post-petition unpaid unemployment taxes of $1,267.10, the TWC did not use the standard form, but rather created a document entitled "Administrative Expense Proof of Claim and Request for Payment."

[3] Hereinafter, any reference to a "Rule" is a reference to the Federal Rules of Bankruptcy Procedure.  Moreover, any reference to "the Code" refers to the United States Bankruptcy Code, and reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, unless otherwise noted.

## II.   FINDINGS OF FACT

1.      The Debtor is a privately-held company owned 100% by Pedro Lagos ("Lagos").

2.      The Debtor was founded in 2014 and its headquarters are located at 724 E 19th Street, Houston, Texas 77008.  The Debtor is in the business of transporting crude oil from sites to pipelines by contracting with individual truckers who operate the Debtor's fleet of trucks and trailers.[4]

3.      The Debtor owns 16 trucks and 26 trailers.

4.      Lagos negotiates with individual truckers to transport crude oil for the Debtor's customers.  There are no written contracts signed between the Debtor and the individual truckers.

5.      Once Lagos receives a request from the Debtor's customers, Lagos notifies truckers in the industry and waits for responses.  Once he receives responses, he negotiates the terms for that particular load.  The individual who accepts the assignment informs Lagos when he will perform the task; Lagos does not give him specific instructions about when he should perform the task so long as this task is done by whatever deadline the customer has imposed. The Debtor's customers typically give the Debtor 24 hours to complete the load; thus, as long as the load is delivered within the 24 hour time period, how and when to deliver the load is up to the truck driver who has accepted the job.

6.      The Debtor provides no training to the individuals who drive the Debtor's trucks in transporting the crude oil for the Debtor's customers.

7.      There is no question that without the Debtor's use of these truck drivers, the Debtor's operations could not be carried out.  Stated differently, the Debtor's success depends upon these individuals delivering the crude oil.

---

[4] The Debtor also uses so called "owners/operators"—i.e., individuals who own their own trucks—to transport crude oil for the Debtor's customers.  However, the dispute at bar involves solely those individuals who do not own their own trucks but rather operate trucks owned by the Debtor.

8.      Once Lagos negotiates with an individual for a specific job, that individual is allowed to assign this task to another individual so long as that individual (a) is properly licensed under applicable state and federal law to operate a truck; and (b) has previously transported oil for the Debtor.

9.      The individuals whom Lagos retains to deliver crude do not supervise any helpers; rather, they operate the trucks by themselves without assistance.

10.     Since its inception, the Debtor has always experienced a high turnover rate among the individual truck drivers it has used. Indeed, Lagos testified at the Hearing that the Debtor's biggest challenge is driver retention. Stated differently, the truck drivers that the Debtor has used do not constantly work for the Debtor, but rather come and go and drive routes for other companies.

11.     The individuals who deliver crude for the Debtor work on their own time and set their own schedules for driving the trucks to deliver the crude. The Debtor does not set their schedules.

12.     The individuals who deliver crude for the Debtor do not devote full time service to the Debtor exclusively. Rather, they enter into agreements with other companies to drive their trucks as well.

13.     The truck drivers who enter into agreements with the Debtor to deliver crude oil choose when to do so and also choose what routes they want to drive. Very infrequently, about 2% of the time, a customer will have a specific need on the sequence of the loads. When this occurs, the Debtor contacts the driver assigned to the load to check whether the customer's needs align with the sequence the driver is willing to undertake. If the driver does not want to follow

the sequence set out by the customer, then the Debtor must find another driver who is willing to follow the sequence as requested by the customer.

14.     The Debtor does not require that the individuals who deliver crude submit regular oral or written reports about the work in progress.  Stated differently, these individuals are not required to notify the Debtor how many hours they have been on the road and how many hours they still have to be on the road to deliver the crude.

15.     The Debtor pays the individuals who deliver the crude by invoice.  Stated differently, these individuals receive payment only after they have actually delivered the crude and the Debtor has received payment from the customer.

16.     The Debtor does not pay the travel expenses of the individuals who deliver the crude to the Debtor's customers.  For example, if a truck driver from New Orleans enters into an agreement with the Debtor to deliver crude from Houston to McAllen, Texas, the Debtor does not pay the costs for that driver to travel from New Orleans to Houston to undertake the job. Further, the Debtor does not pay for any hotel expenses if a trucker needs to stay the night (or nights) in a hotel during the course of a job.  The Debtor does pay for the fuel for the truck once the job begins.

17.     The Debtor does not provide individual truckers with the clothing and accessories required by applicable law, such as hard hats, fire retardant clothing, steel-toed boots, and safety glasses.  The truck drivers must provide these items by themselves or purchase such items from the Debtor.  For those individuals who are not owner/operators (i.e., who own their own trucks), the Debtor does supply one of the trucks from its own fleet for the individual to deliver the crude.

18.     The individuals who make deliveries for the Debtor, but who do not own their own trucks, have no investment in the Debtor's business in general or in the job assignment in particular.   Conversely, the owner/operators who make deliveries for the Debtor do have a significant investment insofar as they own the truck that makes the delivery.

19.     The individuals who make deliveries for the Debtor can either realize a profit or suffer a loss on each job, depending upon how they manage their expenses.

20.     The individuals who make deliveries for the Debtor do not provide such services solely for the Debtor, but rather provide the same or similar services for other companies.   The only prohibition in place is that an individual making deliveries for the Debtor on any particular day may not provide services on that same day for another company.

21.     Individuals who make deliveries for the Debtor hold separate licenses to drive a truck and make their services available to the public at large, as opposed to just the Debtor.

22.     If the individual who is delivering crude for the Debtor fails to actually do so, or fails to return the Debtor-owned truck to the Debtor, then the Debtor will hold back the payment that it would otherwise pay to this individual.

23.     If the work relationship between the Debtor and an individual driver becomes unworkable, the Debtor can terminate the work relationship with the driver.   If this happens, the driver will have no legal recourse against the Debtor.   Conversely, if a driver decides to walk away from the job that he has agreed to undertake for the Debtor, the Debtor does not have any recourse against the driver.   In the words of Lagos, "it is a mutually agreeable relationship . . . until it's not."   [Tape Recording, Apr. 10, 2018, Hrg. at 3:01:00–3:01:11 P.M.].

6

24.     The Debtor provides no health insurance, no medical benefits, and no retirement accounts to any of the individuals with whom it enters into agreements to deliver crude to the Debtor's customers.

25.     The Debtor pays for insurance on the trucks that it owns; the individuals who drive the Debtor's trucks to deliver crude to the Debtor's customers do not pay any portion of this insurance.

26.     The individuals who drive the Debtor's trucks do not have any ownership interest in these trucks.

27.     When the Debtor first started its operations in 2014, it did hire some individuals as employees of the Debtor to serve as truck drivers.  For purposes of the Debtor's tax liability, the relevant time period is the third and fourth quarters of 2014.  Pursuant to a stipulation made in open court by the TWC, the tax amounts of $4,009.50 for the third and fourth quarters of 2014 must be reduced (at this point in an unknown amount) because the TWC agrees that the mechanics who repaired the Debtor's trucks were not employees of the Debtor, but rather independent contractors.

### III.     CREDIBILITY OF WITNESSES

Lagos was the only person who testified at the Hearing.  The Court finds that Lagos testified forthrightly and the Court finds his testimony to be very credible.  The Court therefore gives his testimony substantial weight.

### IV.     CONCLUSIONS OF LAW

A.     Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order

*1. Jurisdiction*

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a).  Section 1334(b) provides that "the district courts shall have original but not exclusive

jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because its resolution affects the administration of the Debtor's Chapter 11 estate. Further, it is a core proceeding under 28 U.S.C. § 157(b)(2)(B) because it involves the allowance or disallowance of claims against the estate—namely, the TWC's claims for employment taxes on wages paid to alleged employees of the Debtor.

*2. Venue*

Venue is proper pursuant to 28 U.S.C. § 1408(1), as the Debtor had its principal place of business in the Southern District of Texas for the 180 days preceding the filing of its Chapter 11 petition. [Finding of Fact No. 2].

*3. Constitutional Authority*

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 564 U.S. 462 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any matter brought before it. In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim." *Id.* at 503. As already noted above, the pending matter before this Court is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and 157(b)(2)(B). Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this

Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here. A core proceeding under 28 U.S.C. §§ 157(b)(2)(A) or 157(b)(2)(B) is entirely different than a core proceeding under 28 U.S.C. § 157(b)(2)(C). *See, e.g., Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *Tanguy v. West (In re Davis)*, 538 F. App'x 440, 443 (5th Cir. 2013) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' . . . We decline to extend *Stern*'s limited holding herein."), *cert. denied sub nom. Tanguy v. West.*, 134 S. Ct. 1002 (2014).

Alternatively, even if *Stern* applies to all of the categories of core proceedings brought under 28 U.S.C. § 157(b)(2), *see First Nat'l Bank v. Crescent Elec. Supply Co. (In re Renaissance Hosp. Grand Prairie Inc.)*, 713 F.3d 285, 294 n.12 (5th Cir. 2013) ("*Stern*'s 'in one isolated respect' language may understate the totality of the encroachment upon the Judicial Branch posed by Section 157(b)(2) . . . ."), this Court still concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order in the dispute at bar. In *Stern*, the debtor filed a counterclaim based *solely* on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendant. The dispute at bar, on the other hand, despite requiring application of state law, arises from an express Code provision and an express Bankruptcy Rule: § 502(a) and Rule 3007. Moreover, unlike *Stern*, application of the state law to this provision will resolve the validity or invalidity of the claims

that the TWC asserts against the Debtor's Chapter 11 estate.  This suit is therefore easily distinguishable from the dispute in *Stern*, and this Court is constitutionally authorized to enter a final order on the Objections.

Finally, in the alternative, this Court has the constitutional authority to enter a final order because the parties have consented to adjudication of this matter by this Court.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed.  Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . ."). Indeed, the TWC filed two separate and distinct proofs of claim [Claim 8-1; Claim 14-1]; the Debtor filed the Objections [Doc. Nos. 169, 172]; the TWC filed responses to the Objections [Doc. Nos.185, 186]; this Court held the Hearing; and at no time did the Debtor or the TWC ever object to this Court's constitutional authority to enter a final order on the Objections.  If these circumstances do not constitute consent, nothing does.

For all of the reasons set forth above, this Court concludes that it has constitutional authority to enter a final order on the Objections lodged by the Debtor.

B.   Applicable Law

   *1.  Burden of Proof and Quantum of Proof Regarding Objections to Proofs of Claim*

Under Rule 3001(f), "a party correctly filing a proof of claim is deemed to have established a prima facie case against [the] [d]ebtor's assets." *Jacobsen v. Sramek (In re Jacobsen)*, 362 F. App'x 413, 2010 WL 271419, at *1 (5th Cir. 2010) (citation omitted); *see also In re RTW Props., L.P.*, No. 2:15-CV-189, 2016 WL 8857229, at *3 (S.D. Tex. May 11, 2016). "To successfully object to a claim, the debtor must present sufficient evidence to overcome the prima facie validity of the claim." *In re RTW Props., L.P.*, 2016 WL 8857229, at *3. "If . . .

evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to prove the validity of the claim by a preponderance of the evidence." *In re B & A Dev. Grp., L.P.*, No. 07-32326, 2007 WL 3376638, at *2 (Bankr. S.D. Tex. Nov. 5, 2007); *see also In re Padilla*, No. 04-42708- H213, 2006 WL 2090210, at *1 (Bankr. S.D. Tex. June 29, 2006) ("Contested matters in the bankruptcy court are civil proceedings that require proof by a preponderance of the evidence[.]").   The ultimate burden of proof always rests upon the claimant. *In re Ultra Petroleum Corp.*, 575 B.R. 361, 367 (Bankr. S.D. Tex. 2017).  Further, the burden does not shift even where the claimant is a state or federal tax authority. *Cal. State Bd. of Equalization v. The Official Unsecured Creditors' Comm. (In re Fidelity Holding Co.)*, 837 F.2d 696, 698 (5th Cir. 1988).

The Court notes that the burden of proof in the dispute at bar is different than if this dispute was in a state district court or in a federal district court, after the parties had actually undergone an administrative hearing and the appeals process within the TWC.  *See* Tex. Lab. Code § 212.201 (West 2018) (emphasis added) (stating that "[a] party aggrieved by a <u>final decision</u> of the commission may obtain judicial review of the decision by bringing an action in a court of competent jurisdiction . . . ."); *Harris Cty. Appraisal Dist. v. Tex. Workforce Comm'n*, 519 S.W.3d 113, 116–17 (Tex. 2017) (detailing administrative procedural history of case prior to case being filed in state district court); *see generally* Tex. Lab. Code § 212 (statutes regarding, *inter alia*, appeals process of TWC decision).  However, as noted *supra*, such an administrate process has never occurred.  Stated differently, if this dispute were in a state district court or a federal district court, the TWC's

> decisions enjoy a presumption of validity, and the party seeking to set aside such a decision has the burden of showing that the decision is not supported by substantial evidence—that is, it is not supported by more than a scintilla of evidence.  A trial court may not set aside a TWC decision merely because it

would have reached a different conclusion; rather, the court may do so only if it finds that the [TWC's] decision was made without regard to the law or the facts and therefore was unreasonable, arbitrary, or capricious. This methodology was purposefully designed by the Legislature so that agency decisions are afforded significant deference, and a court is not allowed to substitute its judgment for that of the agency.

*Harris Cty. Appraisal Dist.*, 519 S.W.3d at 118 (internal citations and quotations omitted). A reviewing court reviews an agency's decision de novo based on the substantial evidence rule. Tex. Lab. Code § 212.202. "[This] process creates a hybrid standard of review wherein a trial court must determine, by an examination of the evidence presented at trial, whether there is substantial evidence to support the agency's ruling." *Wu v. City of San Antonio*, 216 S.W.3d 1, 4 (Tex. App.—San Antonio 2006, no pet.). Further, "determining whether substantial evidence supports the TWC's decision is a question of law." *Tochril, Inc. v. Tex. Workforce Comm'n*, No. 06-15-00078-CV, 2016 WL 3382747, at *5 (Tex. App.—Texarkana June 17, 2016, no pet.).

Here, there was no decision made by the TWC determining that the individuals who drive trucks for the Debtor are employees. Rather, after the Debtor filed its Chapter 11 petition, the TWC filed two proofs of claim asserting that the Debtor owes taxes under the Texas Unemployment Compensation Act because these truck drivers are employees of the Debtor. Under these circumstances, this Court concludes that federal bankruptcy law, not state law, governs who has the burden of proof and what quantum of proof is required. However, even if this Court is incorrect and state law in fact is applicable on these issues—thus requiring the Debtor to show that the TWC's position is not supported by substantial evidence—this Court would still hold that the truck drivers here are independent contractors, not employees. This is because at the Hearing, the Debtor did, in fact, adduce extensive testimony that convinces this Court that there is not substantial evidence that these truck drivers are employees.

2.  *The Texas Unemployment Compensation Act*

Under the Texas Unemployment Compensation Act ("TUCA"), "an employer is obligated to contribute to the unemployment compensation fund on wages for employment paid, in accordance with rules adopted by the Commission." *Critical Health Connection, Inc. v. Tex. Workforce Comm'n*, 338 S.W.3d 758, 761 (Tex. App.—Austin 2011, no pet.) (citing Tex. Lab. Code § 204.002(a)-(b)) (internal quotation marks omitted). TUCA defines "employment" as follows:

> "[E]mployment" means a service, including service in interstate commerce, performed by an individual for wages or under an express or implied contract of hire, unless it is shown to the satisfaction of the commission that the individual's performance of the service has been and will continue to be free from control or direction under the contract and in fact.

Tex. Lab. Code § 201.401.

Thus, the key focus under TUCA when determining whether an "employer" is obligated to contribute to the unemployment compensation fund is whether an employment relationship exists between the "employer" and the individual who provides services. *See Harris Cty. Appraisal Dist.*, 519 S.W.3d at 118. Stated differently, if the individual who provides services is an employee, then the employer must contribute to the unemployment compensation fund; if, however, the individual who provides services is an independent contractor, then the employer is not required to contribute to the unemployment compensation fund.

"A presumption of employment arises upon a showing that an individual is paid for performing services. This presumption is rebutted only if the alleged employer carries its burden of showing that the individual's service is free from control or direction under the contract and in fact." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 118 (internal citation omitted). The TWC has adopted a multi-factor test derived from the common law to determine whether an individual

who provides services is an employee or independent contractor. *See Tex. Workforce Comm'n v. Harris Cty. Appraisal Dist.*, 488 S.W.3d 843, 851 (Tex. App.—Houston [14th Dist.] 2016), *aff'd,* 519 S.W.3d 113 (Tex. 2017). The TWC's 20-factor test for indicating employment is as follows:

> (1) whether the worker receives instructions about when, where, and how the work is to be performed; (2) whether the worker receives training by a more experienced worker or whether the worker is required to attend meetings or take training courses; (3) whether the worker's services are integrated, as the services of an employee are usually merged into the remunerating entity's overall operation; the entity's success depends on those workers' services; (4) whether the worker renders services personally, as employees do not hire their own substitutes or delegate work to them; (5) whether hiring, supervising, and paying helpers is done by the entity; (6) whether there is a continuing relationship, either month after month or year after year; (7) whether the entity sets hours of work, either during hours and days or "on call"; (8) whether working full time is required; (9) whether the entity has a right to mandate the location where services are performed; (10) whether the order or sequence of services are set by the entity; (11) whether submission of oral or written reports is required; (12) whether payment is by the hour, week, or month; (13) whether the entity pays business and travel expenses; (14) whether tools and equipment are furnished; (15) whether the worker has a significant investment in the business, as an employee typically does not; (16) whether the worker realizes profits or losses in the business; (17) whether the worker is permitted to work for more than one firm at a time; (18) whether the worker makes services available to the public; (19) whether the worker may be discharged at any time without liability; and (20) whether the worker may quit at any time without liability.

*Tex. Workforce Comm'n*, 488 S.W.3d at 851–52; *see also* 40 Tex. Admin. Code § 821.5 (West 2018). Depending on the services performed and the type of operation, not all factors may apply and the weight assigned to any specific factor may vary depending on the facts of the case. *See Harris Cty. Appraisal Dist.*, 519 S.W.3d at 118; 40 Tex. Admin. Code § 821.5. Rather, the test the TWC adopted looks at the "twenty different factors to determine whether, on balance, the purchaser of the worker's service 'has the right to direct or control the worker, both as to the final results and as to the details of when, where, and how the work is done.'" *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 119 (quoting 40 Tex. Admin. Code § 821.5).

Here, there is a presumption that truck drivers used by the Debtor are employees because the Debtor does indeed pay these truckers once the Debtor's customers pay the Debtor. [Finding of Fact No. 15]. Thus, the issue is whether the Debtor can overcome this presumption by establishing that all or many of the 20 factors weigh in favor of a finding that the truckers are independent contractors.

C.   Application of the Law to the Facts In the Dispute at Bar

At the Hearing, TWC's counsel stipulated that drivers who provide their own trucks (i.e., owner/operators) are independent contractors. [Tape Recording, Apr. 10, 2018, Hrg. at 1:53:10–1:53:20 P.M.]. Thus, the status of drivers who do not provide their own trucks—that is, those drivers who use the Debtor's trucks when making deliveries—is the only employment determination in question. The analysis set forth below therefore applies only to the status of those truckers who do not provide their own trucks. The Court will review each of the 20 factors in the TWC test in order to arrive at its ruling as to whether the individuals using the Debtor's truck are employees or independent contractors.

*1. Instructions*

"**INSTRUCTIONS:** An Employee receives instructions about when, where, and how the work is to be performed. An Independent Contractor does the job his or her own way with few, if any, instructions as to the details or methods of the work." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 123; 40 Tex. Admin. Code § 821.5. Here, the truckers do not receive any specific instructions from the Debtor on how the work is to be performed. [Finding of Fact No. 5]. The individual who takes on any particular assignment from the Debtor informs Lagos when he will perform the task; Lagos does not give him specific instructions about when he should perform

the task so long as this task is done by whatever deadline the customer has imposed. [Finding of Fact No. 5]. Thus, this factor weighs in favor of independent contractor status.

*2.  Training*

"**TRAINING:** Employees are often trained by a more experienced employee or are required to attend meetings or take training courses. An Independent Contractor uses his or her own methods and thus need not receive training from the purchaser of those services." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 123; 40 Tex. Admin. Code § 821.5. Here, the Debtor does not provide any training to the individuals who drive the Debtor's trucks in transporting the crude oil for the Debtor's customers. [Finding of Fact No. 6]. Thus, this factor weighs in favor of independent contractor status.

*3.  Integration*

"**INTEGRATION:** Services of an Employee are usually merged into the firm's overall operation; the firm's success depends on those Employee services. An Independent Contractor's services are usually separate from the client's business and are not integrated or merged into it." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 124; 40 Tex. Admin. Code § 821.5. At the Hearing, the evidence showed that without the Debtor's use of the truck drivers, the Debtor's operations could not be carried out, and that the Debtor's success depends upon the truck drivers delivering the crude oil. [Finding of Fact No. 7]. Counsel for the Debtor conceded that this factor weighs in favor of finding that the truckers are employees, as opposed to independent contractors. [Tape Recording, Apr. 10, 2018, Hrg. at 3:20:47–3:21:02 P.M.].

*4.  Services Rendered Personally*

"**SERVICES RENDERED PERSONALLY:** An Employee's services must be rendered personally; Employees do not hire their own substitutes or delegate work to them. A

—

true Independent Contractor is able to assign another to do the job in his or her place and need not perform services personally." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 124; 40 Tex. Admin. Code § 821.5. Here, once Lagos negotiates with an individual trucker for a specific job, that individual is allowed to assign this task to another individual so long as the assignee (a) is properly licensed under applicable state and federal law to operate a truck; and (b) the assignee has previously transported oil for the Debtor. [Finding of Fact No. 8]. Although the truck drivers are not given absolute discretion to assign the job to anyone of their choice—i.e., the truck drivers are only permitted to subcontract with another truck driver who is properly licensed and who has delivered oil for the Debtor previously—this factor still weighs in favor of independent contractor status. *See Tochril, Inc.*, 2016 WL 3382747, at *4–5 (finding that nurses' services which must be rendered either personally or through a subcontract with another nurse who works for the same provider favor a finding that the nurses are independent contractors).

   *5. Hiring, Supervising, and Paying Helpers*

   "**HIRING, SUPERVISING & PAYING HELPERS:** An Employee may act as a foreman for the employer but, if so, helpers are paid with the employer's funds. Independent Contractors select, hire, pay and supervise any helpers used and are responsible for the results of the helpers' labor." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 124; 40 Tex. Admin. Code § 821.5. At the Hearing, the parties agreed that this factor is not applicable here. [Tape Recording, Apr. 10, 2018, Hrg. at 3:53:45–3:22:05 P.M., 3:47:28–3:448:05 P.M.].

   *6. Continuing Relationship*

   "**CONTINUING RELATIONSHIP:** An Employee often continues to work for the same employer month after month or year after year. An Independent Contractor is usually hired to do one job of limited or indefinite duration and has no expectation of continuing work."

*Harris Cty. Appraisal Dist.*, 519 S.W.3d at 124; 40 Tex. Admin. Code § 821.5. Here, the Debtor experiences a high turnover rate among the individual truck drivers it uses. [Finding of Fact No. 10]. The truck drivers that have driven for the Debtor in the past do not constantly drive for the Debtor; instead, they come and go and drive routes for other companies as well. [Finding of Fact No. 10]. Thus, this factor weighs in favor of independent contractor status.

   *7. Set Hours of Work*

   **"SET HOURS OF WORK:** An Employee may work 'on call' or during hours and days as set by the employer. A true Independent Contractor is the master of his or her own time and works the days and hours he or she chooses." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 125; 40 Tex. Admin. Code § 821.5. At the Hearing, the evidence showed that the truck drivers who deliver the crude oil work on their own time and set their own schedules for driving the trucks. [Finding of Fact No. 11]. Counsel for the TWC conceded that this factor weighs in favor of finding that the truckers are independent contractors, as opposed to employees. [Tape Recording, Apr. 10, 2018, Hrg. at 3:51:29–3:51:40 P.M.].

   *8. Full Time Required*

   **"FULL TIME REQUIRED:** An Employee ordinarily devotes full-time service to the employer, or the employer may have a priority on the Employee's time. A true Independent Contractor cannot be required to devote full-time service to one firm exclusively." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 125; 40 Tex. Admin. Code § 821.5. At the Hearing, the evidence showed that the truck drivers who deliver crude oil for the Debtor do not devote full time service to the Debtor exclusively. [Finding of Fact No. 12]. The truck drivers enter into agreements with other companies to drive trucks as well. [Finding of Fact No. 12]. Counsel for the TWC

conceded that this factor weighs in favor of finding that the truckers are independent contractors, as opposed to employees.  [Tape Recording, Apr. 10, 2018, Hrg. at 3:52:05–3:52:15 P.M.]

9.   *Location Where Services Performed*

"**LOCATION WHERE SERVICES PERFORMED:**  Employment is indicated if the employer has the right to mandate where services are performed.   Independent Contractors ordinarily work where they choose.  The workplace may be away from the client's premises." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 125; 40 Tex. Admin. Code § 821.5.  At the Hearing, counsel for the TWC, citing *Critical Health Connection, Inc. v. Tex. Workforce Comm'n*, 338 S.W.3d 758 (Tex. App.—Austin 2011, no pet.), argued that this factor weighs in favor of employee status because the Debtor's customers choose where they want the crude oil delivered. This Court finds the facts in the case at bar case differ from those in *Critical Health Connection, Inc.*  In *Critical Health Connection, Inc.*, the court found it notable that once the medical service providers accepted a shift, they had no discretion about when or where the work must be performed.  338 S.W.3d at 767.  Here, the truck drivers who deliver crude oil choose when to do so and also choose what routes they want to drive.  [Finding of Fact No. 13].  Further, in the rare circumstance that a customer will have a specific need on the sequence of the loads, the Debtor contacts the driver assigned to the load to check whether the customer's needs align with the sequence the driver is willing to undertake.  [Finding of Fact No. 13].  If the driver does not want to follow the sequence set out by the customer, then the Debtor must find another driver who is willing to follow the sequence as requested by the customer.  [Finding of Fact No. 13].  Thus, even after the trucker has accepted a job, he can decide not to deliver the load if the customer requests a specific sequence for the load.  [Finding of Fact No. 13].  Further, the truck drivers are free to take routes of their choosing when delivering the load to its assigned destination.

[Finding of Fact No. 5]. Under all of these circumstances this Court finds that this factor weighs in favor of independent contractor status.

*10. Order or Sequence Set*

"**ORDER OR SEQUENCE SET:** An Employee performs services in the order or sequence set by the employer. This shows control by the employer. A true Independent Contractor is concerned only with the finished product and sets his or her own order or sequence of work." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 125; 40 Tex. Admin. Code § 821.5. As discussed with respect factor number 9, the truck drivers who enter into agreements with the Debtor to deliver crude oil choose when to do so and what routes to take to deliver the oil. [Finding of Fact No. 13]. Lagos credibly testified that very infrequently, approximately 2% of the time, a customer will have a specific need regarding the sequence of the loads. [Finding of Fact No. 13]. When this occurs, the Debtor contacts the driver to determine whether the customer's needs align with the sequence the driver is willing to do. [Finding of Fact No. 13]. If the driver does not want to follow the sequence set out by the customer, then the Debtor must find another driver who is willing to follow the sequence as requested by the customer. [Finding of Fact No. 13]. Because a driver is permitted to reject a load assignment if he does not wish to follow the sequence requested by the customer, this factor weighs in favor of independent contractor status.

*11. Oral or Written Reports*

"**ORAL OR WRITTEN REPORTS:** An Employee may be required to submit regular oral or written reports about the work in progress. An Independent Contractor is usually not required to submit regular oral or written reports about the work in progress." 40 Tex. Admin. Code § 821.5. At the Hearing, the evidence showed that the truck drivers are not required to

submit any oral or written reports detailing their route progress to the Debtor. [Finding of Fact No. 14]. Counsel for the TWC conceded that this factor weighs in favor of finding that the truckers are independent contractors, as opposed to employees. [Tape Recording, Apr. 10, 2018, Hrg. at 3:56:25–3:57:15 P.M., 4:19:50–4:20:47 P.M.].

*12. Payment by the Hour, Week, or Month*

"**PAYMENT BY THE HOUR, WEEK OR MONTH:** An Employee is typically paid by the employer in regular amounts at stated intervals, such as by the hour or week. An Independent Contractor is normally paid by the job, either a negotiated flat rate or upon submission of a bid." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 126; 40 Tex. Admin. Code § 821.5. At the Hearing, the evidence showed that the Debtor pays the truck drivers by the job. [Finding of Fact No. 15]. Counsel for the TWC conceded that this factor weighs in favor of finding that the truckers are independent contractors, as opposed to employees. [Tape Recording, Apr. 10, 2018, Hrg. at 3:58:00–3:58:07 P.M.].

*13. Payment of Business and Travel Expenses*

"**PAYMENT OF BUSINESS & TRAVEL EXPENSES:** An Employee's business and travel expenses are either paid directly or reimbursed by the employer. Independent Contractors normally pay all of their own business and travel expenses without reimbursement." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 126; 40 Tex. Admin. Code § 821.5. Here, the Debtor does not pay the travel expenses of the truck drivers. [Finding of Fact No. 16]. For example, if a truck driver needs to stay overnight in the hotel during the course of a job, the Debtor does not pay the hotel expenses. [Finding of Fact No. 16]. The Debtor, however, does pay for the fuel for the truck once the delivery job begins. [Finding of Fact No. 16]. At the Hearing, counsel for the Debtor argued that because the test for whether an employment relationship exists for this factor

is whether "[a]n Employee's business <u>and</u> travel expenses are either paid directly or reimbursed by the employer," this factor weighs in favor of independent contractor status because the Debtor does not pay <u>all</u> of the truck drivers' business and travel expenses.   The Court agrees with counsel for the Debtor's argument.   "It is a fundamental canon of statutory construction . . . that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *United States v. Singleton*, 946 F.2d 23, 24–25 (5th Cir. 1991) (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979)).   The TWC itself adopted the 20 factor test set forth in Texas Administrative Code § 821.5. *See Harris Cty. Appraisal Dist.*, 519 S.W.3d at 118 ("The TWC has adopted a regulation [i.e., Texas Administrative Code § 821.5] setting out guiding principles to assist with the employment determination.").   By using the conjunctive word "and," the TWC has determined that employee status will be favored only when both business <u>and</u> travel expenses of an individual worker are reimbursed (or paid for outright).   Here, the Debtor does not pay for (or reimburse) the business <u>and</u> travel expenses of the truck drivers; the truck drivers themselves pay for all of their travel expenses and the only business expense the Debtor pays for is fuel for the truck when the individual is actually delivering the oil.

Additionally, factor 13 states that "Independent Contractors <u>normally</u> pay all of their own business and travel expenses without reimbursement." 40 Tex. Admin. Code § 821.5 (emphasis added).   There is no such qualifying language describing the conditions for employee status under this factor.   Thus, factor 13 can still weigh in favor of independent contractor status when the worker in question has some of his or her business and/or travel expenses reimbursed by the company which is using the worker's services.   The Court finds this to be the case here.

For all the reasons set forth above, this Court finds that this factor weighs in favor of independent contractor status.

*14. Furnishing Tools & Equipment*

"**FURNISHING TOOLS & EQUIPMENT:** Employees are furnished all necessary tools, materials and equipment by their employer.   An Independent Contractor ordinarily provides all of the tools and equipment necessary to complete the job." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 126; 40 Tex. Admin. Code § 821.5.   Here, the Debtor does not provide truck drivers with the tools or equipment required by applicable law, such as hard hats, fire retardant clothing, steel-toed boots, and safety glasses.  [Finding of Fact No. 17].   The truck drivers must provide these items themselves or purchase these items from the Debtor.  [Finding of Fact No. 17].  For drivers who do not own their own truck and who agree to deliver crude oil to the Debtor's customers, the Debtor will supply one of its trucks to for the driver to deliver the crude.  [Finding of Fact No. 17].  Even though the truck drivers provide some of their own tools and equipment—namely in the form of safety attire needed for the job (e.g., fire retardant clothing, hard hats, steel-toed boots, and safety glasses)—the Debtor supplies the main, necessary piece of equipment needed to perform the delivery job:  the truck.  The truck drivers providing their own job specific attire but the Debtor providing the "essential" piece of equipment—the truck—are similar to the circumstances in *Tochril, Inc. v. Tex. Workforce Comm'n*, No. 06-15-00078-CV, 2016 WL 3382747 (Tex. App.—Texarkana June 17, 2016, no pet.) and *Critical Health Connection, Inc. v. Tex. Workforce Comm'n*, 338 S.W.3d 758 (Tex. App.—Austin 2011, no pet.).  In *Tochril, Inc.* and *Critical Health Connection, Inc.*, the courts found that factor 14 weighed in favor of employee status when the nurses provided their own scrubs and stethoscopes but the facilities where the nurses performed their services provided all other "necessary" or "essential" tools for the job.  *Tochril, Inc.*, 2016 WL 3382747, at *4–5; *Critical Health Connection, Inc.*, 338 S.W.3d at 765, 767.   Here, the Court finds that the truck

drivers providing their own safety attire but using the Debtor's trucks to complete the delivery of crude weighs in favor of a finding of employee status.

### 15. Significant Investment

"**SIGNIFICANT INVESTMENT:** An Employee generally has little or no investment in the business. Instead, an Employee is economically dependent on the employer. True Independent Contractors usually have a substantial financial investment in their independent business." 40 Tex. Admin. Code § 821.5. At the Hearing, the evidence showed that the truck drivers who make deliveries for the Debtor (and do not own their own trucks) have no investment whatsoever in the Debtor's business. [Finding of Fact No. 18]. The Court finds that these circumstances weigh in favor of a finding of employee status.

### 16. Realize Profit or Loss

"**REALIZE PROFIT OR LOSS:** An Employee does not ordinarily realize a profit or loss in the business. Rather, Employees are paid for services rendered. An Independent Contractor can either realize a profit or suffer a loss depending on the management of expenses and revenues." 40 Tex. Admin. Code § 821.5. At the Hearing, the evidence showed that the truck drivers who make deliveries for the Debtor can either realize a profit or suffer a loss on each job depending upon how they manage their expenses. [Finding of Fact No. 19]. Counsel for the TWC conceded that this factor weighs in favor of finding that the truckers are independent contractors, as opposed to employees. [Tape Recording, Apr. 10, 2018, Hrg. at 4:09:45–4:10:22 P.M., 4:19:50–4:20:47 P.M.].

### 17. Working for More than One Firm at a Time

"**WORKING FOR MORE THAN ONE FIRM AT A TIME:** An Employee ordinarily works for one employer at a time and may be prohibited from joining a competitor. An Independent Contractor often works for more than one client or firm at the same time and is not

subject to a non-competition rule." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 127; 40 Tex.
Admin. Code § 821.5. At the Hearing, evidence showed that the truck drivers who make crude
oil deliveries for the Debtor do not drive solely for the Debtor; rather, they provide the same or
similar services for other companies. [Finding of Fact No. 20]. Counsel for the TWC conceded
that this factor weighs in favor of finding that the truckers are independent contractors, as
opposed to employees. [Tape Recording, Apr. 10, 2018, Hrg. at 4:10:53–4:10:58 P.M.].

   *18. Making Service Available to the Public*

   "**MAKING SERVICE AVAILABLE TO THE PUBLIC:** An Employee does not
make his or her services available to the public except through the employer's company. An
Independent Contractor may advertise, carry business cards, hang out a shingle or hold a separate
business license." *Harris Cty. Appraisal Dist.*, 519 S.W.3d at 127; 40 Tex. Admin. Code §
821.5. At the Hearing, the evidence showed that the truck drivers hold separate licenses to drive
a truck and make their services available to the public at large, as opposed to just the Debtor.
[Finding of Fact No. 21]. Counsel for the TWC conceded that this factor weighs in favor of
finding that the truckers are independent contractors, as opposed to employees.  [Tape
Recording, Apr. 10, 2018, Hrg. at 4:11:45–4:11:53 P.M.].

   *19. Right to Discharge Without Liability*

   "**RIGHT TO DISCHARGE WITHOUT LIABILITY:** An Employee can be
discharged at any time without liability on the employer's part. If the work meets the contract
terms, an Independent Contractor cannot be fired without liability for breach of contract."
*Harris Cty. Appraisal Dist.*, 519 S.W.3d at 127; 40 Tex. Admin. Code § 821.5. Lagos testified
that if the relationship between the Debtor and an individual driver becomes unworkable, the
Debtor can terminate the work relationship with the driver. [Finding of Fact No. 23]. If this

happens, the driver will have no legal recourse against the Debtor. [Finding of Fact No. 23]. In Lagos' own words: "It is a mutually agreeable relationship . . . until it's not." [Finding of Fact No. 23]. Thus, this factor weighs in favor of employee status.

*20. Right to Quit Without Liability*

"**RIGHT TO QUIT WITHOUT LIABILITY:** An Employee may quit work at any time without liability on the Employee's part. An Independent Contractor is legally responsible for job completion and, on quitting, becomes liable for breach of contract." *Harris Cty. Appraisal Dist.,* 519 S.W.3d at 128; 40 Tex. Admin. Code § 821.5. At the Hearing, Lagos testified that if a driver decides to walk away from the job that he agreed to undertake for the Debtor, the Debtor does not have any recourse against the driver. [Finding of Fact No. 23]. As noted above, Lagos stated, "It is a mutually agreeable relationship . . . until it's not." [Finding of Fact No. 23]. Additionally, in the Debtor's responses to the TWC's requests for admissions, the Debtor admitted that the truck drivers can stop working for the Debtor at any time without incurring any contractual liability. [TWC's Ex. H, RFA No. 27]. Thus, this factor weighs in favor of employee status.

D.   Summary of the 20 Factors as Applied in the Dispute at Bar

In sum, five factors weigh in favor of finding that the truckers are employees,[5] while fourteen factors weigh in favor of finding that the truckers are independent contractors.[6] The parties agree that one factor—factor 5—is inapplicable in this case. Here, a presumption of employment arose because the Debtor pays the truckers for performing services. *See Harris Cty. Appraisal Dist.*, 519 S.W.3d at 118. At the Hearing, Lagos credibly testified about his business and its use of and relationship with the individuals who drive the Debtor's trucks, and his

---

[5] Factors 3, 14, 15, 19, and 20 weigh in favor of employee status.

[6] Factors 1, 2, 4, 6, 7, 8, 9, 10, 11, 12, 13, 16, 17, and 18 weigh in favor of independent contractor status.

testimony proved that the trucker's services are free from control or direction, thus rebutting the presumption of employment. *See id.* The Debtor has therefore overcome the prima facie validity of the TWC's claim. For its part, the TWC did not introduce any evidence and therefore did not meet its burden to prove the validity of its claims—i.e., that the truckers are the Debtor's employees. Thus, the TWC did not ultimately carry its burden. As "a substantial majority of the relevant factors,"[7] indicate that the truck drivers are independent contractors, the Court finds that the individuals who have driven the Debtor's trucks are not employees of the Debtor, but rather are independent contractors. This Court has discretion to afford more weight to certain factors. *Tochril*, 2016 WL 3382747, at *3 (citation omitted) ("The weight assigned to a specific factor may vary depending on the facts of the case."). Here, the Court sees no reason why it should not give the same weight to each of the 19 factors that are applicable in the matter at bar.

Assuming *arguendo* that the TWC had issued a decision and the parties had gone through the statutorily prescribed administrative process in appealing that decision, and therefore state law regarding the burden of proof applies,[8] this Court still finds that the Debtor has overcome the presumption that the truck drivers are employees, and has met its burden to show that the TWC's position (i.e., that these truck drivers are employees) is not supported by substantial evidence. The evidence introduced by the Debtor reflects that 14 of the 19 applicable factors reflect that these drivers are independent contractors, and that only 5 of the 19 factors support a finding that they are employees. This Court finds that the existence of 5 out of 19 factors does not constitute the "substantial evidence" necessary to find that the truckers are employees. Other courts that have reviewed the issue of whether workers are employees or independent contractors for

---

[7] *Critical Health Connection, Inc.*, 338 S.W.3d at 768.

[8] The Court emphasizes that there is no indication whatsoever that the parties engaged in the normal administrative process as set forth in the Texas Labor Code § 212 *et seq.* for determining the employment status of the truckers.

purposes of TUCA after the administrative process has been exhausted have found that the substantial evidence burden has been met when 10 to 15 of the applicable factors have weighed in favor of employee status; here, similarly, this Court finds that the Debtor has met its burden of showing that the TWC's decision to categorize the truckers as employees was not supported by substantial evidence when only 5 of the applicable 19 factors weigh in favor of employee status (i.e., the other 14 applicable factors weigh in favor independent contractor status). *Cf. Harris Cty. Appraisal Dist.*, 519 S.W.3d at 123–28 (affirming lower court decision that there is substantial evidence to support the TWC's determination that the individuals were employees where 10 of 19 factors favoring employee status were present); *Tochril, Inc.*, 2016 WL 3382747, at *5 (affirming trial court's decision that TWC proved that substantial evidence supported its decision finding workers were employees when 11 of 16 applicable factors favored employee status); *Tex. Workforce Comm'n*, 488 S.W.3d at 853–55 (holding that substantial evidence supported the TWC's decision that workers were employees when 15 factors favored employee status); *Critical Health Connection, Inc.*, 338 S.W.3d at 766–67 (affirming company is worker's employer when a "substantial majority"—or 13 of the 17 applicable factors—favor employee status). Here, the paucity of factors favoring employee status results in this Court finding that there is not substantial evidence that the truck drivers are employees of the Debtor.

E.   The Case Cited by the TWC from 1957 is Not Persuasive Given that the TWC Promulgated the 20 Factor Test In 1998

Finally, at the Hearing, counsel for the TWC argued that the Court should consider *Johnston v. Texas*, 303 S.W.2d 520 (Tex. Civ. App.—Austin 1957, writ ref'd n.r.e) as persuasive. In *Johnston*, the court of civil appeals considered whether truck drivers qualified as employees or independent contractors for purposes of the State Unemployment Compensation Fund under Article 5221b, Vernon's Revised Civil Statutes. 303 S.W.2d at 521. The appeals

court affirmed the trial court's finding that the truck drivers were employees. *Johnston*, 303 S.W.2d at 522. This Court declines to extend *Johnston's* holding that the truck drivers at issue here are employees, rather than independent contractors. *Johnston* predates the TWC's 20 factor test, promulgated in 1998 and codified in the Texas Administrative Code. *See* 40 Tex. Admin. Code § 821.5; 23 Tex. Reg. 5731 (May 29, 1998). While the Court in *Johnston* did analyze a few of the factors encompassed by the 20 factor test—e.g., truck drivers were not obligated to make any trips, the driver could take whatever route he liked, the number of hours he drove was within the driver's discretion, and the company furnished the truck, 303 S.W.2d at 522— *Johnston* did not come within hailing distance of analyzing the **20** factors that have since been codified. Consideration of the TWC's 20 factors leads this Court to a different conclusion than the court in *Johnston*, which considered a significantly smaller set of factors.

## V. CONCLUSION

For the reasons set forth herein, the Court sustains the Objections. Therefore, the amounts set forth in Claim No. 8 and Claim No. 14 are disallowed in their entirety. However, this does not bring complete closure to this matter. At the Hearing, counsel for the Debtor stipulated that when the Debtor first began operating in 2014, it did hire some individuals in the third and fourth quarter of 2014 who fall within "employee" status. [Finding of Fact No. 27]. Further, at the Hearing, counsel for the TWC stipulated that the tax amount of $4,009.50 for the third quarter and fourth quarter of 2014 must be reduced because the TWC agrees that the mechanics who repair the Debtor's trucks at that time were not employees of the Debtor, but rather were independent contractors. [*Id.*]. What the parties could not stipulate to at the Hearing was how much of a reduction of the $4,009.50 should be made. The Court therefore directs the Debtor and TWC to confer and determine if they can agree upon an amount. If they can, then

they should submit an agreed motion and a proposed agreed order.  If they cannot, then the TWC shall be allowed to file a new proof of claim setting forth the amount that it believes is appropriate, and the Debtor shall be allowed to file an objection—in which event the Court will hold a separate hearing thereon.

An order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed on this 27th day of April, 2018.

Jeff Bohm
United States Bankruptcy Judge